**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Jeffrey L. Johnson,

Plaintiff,

Civil File No. 00-240 (MJD/JGL)

v.

**MEMORANDUM AND ORDER**

John E. Potter, Postmaster General, and the United States Postal Service,

Defendants.

---

This matter is before the Court on Defendants' Motion for Summary Judgment and Defendants' Motion to Strike Portions of Affidavit of Greg Wiley and Arguments Based Thereon. For the reasons that follow, Defendants' Motion for Summary Judgment is denied and Motion to Strike is granted.

**BACKGROUND**

Plaintiff Jeffrey L. Johnson ("Johnson") commenced the underlying action against Defendants John E. Potter ("Potter") and the United States Postal Service ("USPS") for race discrimination and retaliation. The claims before this Court include a claim for a racially hostile work environment and a claim for retaliation. Plaintiff does not dispute Defendants' motion with respect to his claims for discrimination based on disparate impact and for punitive damages.

In April 1998, the USPS conducted a route inspection at the Elmwood Station where



DEC 21 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Johnson was a mail carrier. On April 28, 1998, postal supervisor Steve Steblay ("Steblay"), while not a manager at the Elmwood Station, was assigned to oversee Johnson's performance on his route. As Johnson was sorting his mail to prepare for his route, Steblay approached within five feet of Johnson carrying a ten-foot bullwhip, raised the whip over his head, and snapped it within two to three feet of Johnson while stating "Let's get to work." Johnson asserts that Steblay snapped the whip only at him. Johnson was the only African-American of the 44 postal carriers at the Elmwood Station. Johnson asserts that he was in shock over the incident, which he considers threatening, violent, and racially charged. Defendants maintain that immediately after the incident, supervisors in the area instructed Steblay to put away the whip. Nevertheless, Steblay was still permitted to supervise Johnson's route inspection and to follow him on the route.

Johnson asserts that no postal employee spoke to him on how he felt about the incident. Johnson asserts that even when Jim Hudy ("Hudy"), the station manager, came out to talk to Steblay about Johnson's performance on the route, Hudy did not speak to Johnson or mention the incident. Johnson asserts that it was not until June 1998 when one of his supervisors, Rod Hanson ("Hanson"), spoke to him about the inspection. Even then, according to Johnson, he broached the subject of the bullwhip incident, not Hanson. Johnson then asked to be kept informed about the progress of the investigation into the incident. Johnson asserts that he never heard anything about the results of the investigation until he approached Postmaster Rochelle Eastman ("Eastman").

The USPS claims that Steblay was demoted in response to the bullwhip incident. Johnson asserts that the factual record indicates otherwise. In particular, Johnson asserts that Steblay downgraded voluntarily. Johnson also asserts that the bullwhip incident is not mentioned anywhere in Steblay's personnel file.

Thereafter, in the summer of 1998, Johnson asserts that supervisors yelled at him on two occasions. First, Sharon Lindemeier-Ruble ("Lindemeier-Ruble") yelled at Johnson when they were discussing an attendance issue. Second, Rudy yelled at Johnson when Johnson complained about being physically threatened by customers on his mail route. Johnson reported that an elderly woman grabbed his arm when he refused to deliver her mail and that he believed her husband, who held his hand in his pocket, may have been hiding a gun. Johnson asserts that in response to his report of the incident, Hudy angrily jumped in his face and yelled at him, telling him that he had to deliver the mail to the customers if he wanted to keep his job. Johnson also asserts that he was referred to the Employee Assistance Program on one occasion, and that on other occasions, his leave slips were not forwarded, thus delaying his sick pay.

Johnson asserts that in the fall of 1998, he was also treated differently because of his race when he was denied a restricted duty assignment at the Elmwood Station that was granted to a part-time white employee with less seniority. Consequently, Johnson was forced to transfer to Fridley, a less desirable location. When the Fridley location no longer needed him, he was denied a request to work at the Elmwood location again and missed six weeks

of work, without pay. The USPS asserts that the assignment was given to the white employee because he did not require full-time hours. Johnson believes, however, that the white employee did work full-time hours, and asserts that the USPS refuses to provide that employee's time records to dispute this notion.

Johnson asserts that as a result of these incidents, he suffers psychologically, experiences physical symptoms related to his anxiety, and his relationship with his girlfriend has been effected. Accordingly, Johnson filed the underlying lawsuit. Defendants now move for summary judgment.

**DISCUSSION**

1. Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. See Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik, 47 F.3d at 957. The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most

favorable to the nonmoving party. See Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).

2. Hostile Work Environment

To establish a claim of hostile work environment based on race, Johnson must show that: (1) he is a member of a protected group; (2) he was subjected to unwelcome harassment; (3) a causal nexus exists between his membership in the protected group and the harassment; (4) the harassment affected a term, condition, or privilege of his employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. Mems v. City of St. Paul, Dept. of Fire and Safety Serv., 224 F.3d 735 (8th Cir. 2000). In this case, Defendants argue that they are entitled to summary judgment for several reasons.

A. Race-Based

First, Defendants argue that Plaintiff fails to demonstrate that the alleged harassment was race-based. The Court, however, will not make such a finding as a matter of law. Plaintiff has demonstrated that he is a member of a protected racial minority group and that he was subjected to unwelcome harassment. With respect to the bullwhip incident, Plaintiff has alleged that he was the only person toward whom a supervisor, Steblay, snapped the whip and said, "Let's get to work." Plaintiff was also the only African American of the 44 postal carriers at his station.

Defendants attempt to minimize the significance of Steblay's actions by suggesting

that even if the "connotation" of snapping the whip has racial overtones, it is not enough to show actual racial "motive." At hearing, counsel for Defendants read the headline of a newspaper article in which University of Minnesota President Yudof mentioned snapping the whip when discussing University students. The Court finds that counsel's comparison is misguided. There is nothing about President Yudof's verbal reference to snapping the whip when discussing students in general to remotely suggest a racial overtone or motive.

In stark contrast in this case, a reasonable juror could infer racial motive from Steblay's actions. Steblay's act of snapping the whip was physical. Steblay, a white male, snapped a ten-foot bullwhip at Johnson, the only African American employee at the station. When snapping the whip at Johnson, Steblay said, "Let's get to work." These actions raise images so deeply a part of this country's collective consciousness and history, any explanation of how one could infer a racial motive appears quite unnecessary. See e.g., Williams v. N.Y. City Hous. Auth., 154 F. Supp.2d 820 (S.D.N.Y. 2001) (discussing incident involving supervisor's display of a noose in the workplace). Clearly, in this context, the bullwhip could be viewed as an instrument of fear, infused with racial meaning and racial violence. Kenneth M. Stampp, To Make Them Stand in Fear, in The Peculiar Institution: Slavery in the Ante-Bellum South 146, 174-78 (Alfred A. Knopf 1967) (1956). The whip was the most common instrument of punishment in the antebellum South, and it was "the emblem of the master's authority." Id. at 174. The threat of the whip compelled servitude, as slave owners, overseers, or "drivers" could beat, whip, and abuse their slaves with

impunity. Remembering Slavery 3-5 (Ira Berlin, Marc Favreau & Steven F. Miller eds., 1998). Many former slaves remember the "bull whip" days, and recount vividly the cruel lashings they and others received. Id. at 20-21, 27-29, passim. Even a cursory survey of this nation's legacy of violence against African Americans demonstrates how easily racial motive could be inferred from a supervisor's use of a bullwhip in the workplace.

Defendants also argue that Johnson has failed to demonstrate disparate treatment because he was not similarly situated to Tim Bakey ("Bakey"), the white employee who was permitted to work at Elmwood Station after his injury. Defendants argue that Johnson was injured on the job, and therefore, the USPS was required to guarantee him 40 hours of work within his work restrictions. Defendants assert that Bakey was injured off the job, and the USPS was not required to guarantee him 40 hours of work. Defendants also assert that Johnson had a back injury, and Bakey had a leg injury.

The Court finds that at the very least, a fact a question exists as to whether Johnson and Bakey were similarly situated in relevant respects for the purposes of proving pretext. Both men were postal carriers and both men sustained injuries requiring light duty assignments. Both men were able to perform similar duties such as casing mail and answering telephones. Furthermore, Johnson has raised a question as to whether the USPS's assertion that it could not guarantee him full-time work is pretextual. At the EEO hearing in this matter, Bakey testified that the Elmwood Station was "very shorthanded." (Bakey Test. p. 245.) Johnson maintains that Bakey actually worked 40 hours per week, but that the

USPS has redacted the hours on Bakey's timecard making it impossible to confirm. On the other hand, Johnson was apparently not guaranteed 40 hours of work because the Fridley Station eventually no longer needed him and he missed six weeks of work without pay.

Defendants do not argue whether any or all of the incidents were sufficiently severe to constitute harassment, but rather, reserve that issue for trial.

B. Remedial Action

Next, Defendants argue that the USPS took prompt remedial action to end the harassment with respect to the bullwhip incident. Nevertheless, Johnson has raised several issues to dispute the notion that the USPS's action was prompt and adequate. After the incident, Steblay was still permitted to accompany Johnson and supervise him on his route. Additionally, according to Johnson, no supervisor would directly broach the subject of the bullwhip incident with Johnson, and no one informed him about the progress of any investigation into the matter until he inquired about it himself. Finally, Johnson asserts that Steblay downgraded voluntarily and was not demoted by the USPS for the bullwhip incident. Johnson asserts that, in fact, Steblay's personnel file contains no reference to the bullwhip incident. As the Eighth Circuit has noted, "[t]he promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve." Carter v. Chrysler Corp., 173 F3d 693, 702 (8th Cir. 1999). Whether Defendants took appropriate remedial action is best left to the jury to determine. The Court concludes that genuine issues of material fact preclude summary judgment on Johnson's hostile work environment claim.

3. <u>Retaliation</u>

To establish a prima facie case of retaliation, Johnson must show that (1) he engaged in protected conduct; (2) the employer took an adverse employment action against him; and (3) a causal connection existed between participation in the protected activity and the adverse employment action. <u>Buettner v. Arch Coal Sales Co., Inc.</u>, 216 F.3d 707, 713-714 (8th Cir. 2000).

Defendants argue that Johnson has failed to establish a prima facie case of retaliation. Defendants argue that Johnson suffered no adverse employment action and that Johnson has failed to show a causal connection.

Johnson asserts that in response to his request of Hanson in June 1998, to be kept abreast of the investigation into the bullwhip incident, and his request to Eastman about the investigation, he suffered retaliation. According to Johnson, such retaliation included that he was yelled at by supervisors, was referred to the Employee Assistance Program on one occasion, had his pay delayed because leave slips were not forwarded, had his personnel file papered by being written up for four minor incidents, and was denied a restricted duty request. Then while on restricted duty, Johnson was transferred to a less desirable station at Fridley to work and missed six weeks of work without pay.

Lost wages constitute a concrete adverse employment action. <u>Kerns v. Capital Graphics, Inc.</u>, 178 F.3d 1011, 1016-17 (8th Cir. 1999). Viewing the facts in the light most favorable to Plaintiff, the Court finds that Johnson has generated a jury question with respect

to the retaliation claim. The jury must determine whether Johnson's reports and queries were a motivating factor in causing the alleged retaliation. Summary judgment on Johnson's retaliation claim, therefore, would be inappropriate.

4. Affidavit

Defendants also move to strike portions of the affidavit of Greg Wiley and the arguments based thereon, in which Wiley relates that he conducted an interview with postal employee and union steward Phillip Johnson, who believes that the Post Office discriminated against Plaintiff based on his race. The Court need not and did not rely on that portion of the affidavit in its ruling. Nevertheless, that portion of the affidavit is stricken, as it is inadmissible hearsay and does not constitute an admission by the USPS.

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment (Clerk Doc. No. 45) is **DENIED**; and

2. Defendants' Motion to Strike (Clerk Doc. No. 42) is **GRANTED**.

Dated: Dec. 21, 2001

Michael J. Davis
United States District Court Judge